PALO SAVINGS BANK, Appellant, v. GEORGE W. CAMERON et al., Appellees.

CHATTEL MORTGAGES: Validity—Withholding from Record. Inadvertently withholding a mortgage from record works no invalidation as to a creditor who became such *before* the mortgage was executed, or *after* he had actual or constructive notice of the mortgage. This is true even though the prior-acquired obligation was a demand note, when the creditor never sought collection thereon until after the mortgage was recorded.

ATTACHMENT: Indemnifying Bond—Judgment. A mortgagee, upon establishing the validity of his mortgage against an attaching creditor of the mortgagor, is not entitled to judgment on a so-called indemnifying bond, given, under Sec. 3988, Code Supp., 1913, by the attaching creditor to the levying officer, when, pending the controversy over the validity of the mortgage, the attached property was not sold under the levy, but was, without objection by the mortgagee, placed and retained in the hands of a receiver.

SALES: Bulk Sales Act—Rebutting Presumption of Fraud. The presumption of fraud arising from a sale in bulk without giving

the statutory notice of intention to sell is wholly rebutted by a showing that the creditor, with full and explicit knowledge, actively participated in the sale by his debtor. (Sec. 2911-b, Code Suppl. Supp., 1915.)

ATTACHMENT:    Wrongful Attachment—Damages for Levy on 4   Mortgaged Chattels.    Actual damages for wrongful attachment on validly mortgaged chattels may not, under any circumstances, exceed the difference between the value of the chattels and the amount of the mortgage thereon.

*Appeal from Linn District Court.*—JOHN T. MOFFIT, Judge.

SEPTEMBER 17, 1918.

THIS action was originally begun by the plaintiff against the defendant, George W. Cameron, to recover a sum claimed to be due it from Cameron. In this action the plaintiff sued out an attachment, and levied upon a certain stock of goods owned by Cameron. At the time of the levy, the goods were mortgaged. Thereafter, the mortgagees appeared and claimed the property under their mortgage. A receiver was appointed to take charge of the property, pending the controversy between the mortgagees and the attaching creditor. The mortgagees prevailed. In the original suit, the defendant, Cameron, appeared and filed a counterclaim upon the bond, urging that the attachment was wrongfully sued out. Judgment was entered for the defendant, Cameron, upon his counterclaim. Plaintiff appeals in each case. *Affirmed* in the equity action involving the validity of the mortgage. *Reversed* in the action in which it was sought to recover damages on the attachment bond.

*Redmond & Stewart,* for appellant.

*Tobin & Tobin* and *Tourtellot & Donnelly,* for appellees.

GAYNOR, J.—Though tried separately in the court below, and separate appeals taken and separate abstracts

filed, two cases are submitted to us, to be considered together and disposed of in one opinion. This is done because the preliminary facts are common to both cases, and are necessarily considered in the disposition of each.

I. The plaintiff, the Palo Savings Bank, is a corporation organized under the laws of this state, and was, at the time of the happening of the matters hereinafter referred to, doing business as such in the town of Palo, Linn County, Iowa. The defendant, George W. Cameron, was a merchant engaged in business in that town. On the 27th day of July, 1915, the plaintiff commenced this action against the defendant, Cameron, and aided the same by an attachment, which was duly levied upon a certain stock of goods owned by the defendant, Cameron. The grounds of the attachment were that the defendant is about to convert his property, to wit, a stock of merchandise, into money, for the purpose of placing it beyond the reach of his creditors, and that the defendant has property and rights in action which he conceals. The plaintiff having taken possession of the stock of goods through the sheriff, under the attachment, one Martin P. Beck appeared, and, on the 30th day of July, 1917, served notice on the sheriff to release the property levied upon, alleging that he was the holder of a chattel mortgage thereon, executed to him by the defendant, George W. Cameron, on the 30th day of November, 1914, to secure the payment of $1,800; that this mortgage was duly recorded on the 23d day of February, 1915; that the mortgage was given to secure the sum of $1,800, $1,000 of which was due to the said Beck, and $800 to one Roy Cameron. Upon the receipt of such notice, the plaintiff gave the sheriff an indemnifying bond, in pursuance of Section 3988 of the Code Supplement, 1913.

Thereupon, the plaintiff filed an amendment to its petition, alleging that, after the filing of the original petition

1. CHATTEL MORTGAGES: validity: withholding from record.

and the issuance of the writ of attachment and the levy thereof on the stock of goods, one Martin P. Beck and Roy Cameron served notice upon it to release the levy, claiming that they had a chattel mortgage upon the property, superior to the lien of the attachment. In this amendment, plaintiff denied the validity of the mortgage, and averred that, if these parties had any such mortgage, the same is fraudulent and void as to the plaintiff, and junior and inferior to plaintiff's rights under the attachment, alleging further that plaintiff had given an indemnifying bond to the sheriff in pursuance of the notice. It alleged further that, upon the levy of the attachment upon the goods, one Fred Kahler was placed in charge by the sheriff, and has said stock of goods in his custody; that the said Kahler is a proper and suitable person to take and have charge of said property, and is more or less familiar with the stock of goods, and is a proper person to be appointed receiver of said stock. Thereupon, plaintiff prayed that Kahler be appointed receiver, to take charge of said store, under the order and direction of the court, until such time as the rights of the plaintiff, under this levy, and the rights of Beck and Roy Cameron, under the alleged chattel mortgage, might be determined and adjudged.

Upon the filing of this amendment to the petition, Kahler was appointed receiver, and took possession of the goods. He was authorized and empowered to carry on and conduct the store as before carried on, and to replenish the stock in suitable quantities to meet the requirements of the trade. Thereafter, Martin P. Beck and Roy Cameron appeared, answered plaintiff's amendment to its petition, denied the allegations thereof, and filed a cross-petition, claiming that their mortgage was prior and superior to the lien of plaintiff's attachment, and that the note secured by said mortgage was due and unpaid, and praying that they have judgment for the amount due upon

the note secured by said mortgage, and that defendants' lien thereunder be declared superior to any rights of the plaintiff in the property. The issue thus tendered was transferred to the equity side of the court for trial. This is the matter involved in the first appeal.

On the 4th day of January, 1916, the defendant, George W. Cameron, appeared and filed answer to the plaintiff's original petition, and at the same time filed a counterclaim on the attachment bond, alleging that the attachment was wrongfully sued out, denying that the grounds existed upon which the attachment was predicated, and alleging further, that plaintiff had no probable cause for believing the ground stated to be true, and that he was damaged by reason thereof. The issue tendered by the counterclaim between the plaintiff and the defendant, George W. Cameron, was continued for trial to a jury, to be determined after the disposition of the equitable issues presented. This presents the matter involved in the second appeal.

The equitable issues arising between the plaintiff, on the one side, and Beck and Roy Cameron on the other, as to the priority and superiority of their respective claims, were tried before Judge Moffit; and at that hearing, judgment was entered for the plaintiff against the defendant, George W. Cameron, for the amount of plaintiff's claim against Cameron, as asserted in the several counts of his original petition. The mortgage held by Beck and Roy Cameron was adjudged valid and prior and superior to any claim which the plaintiff had acquired under its attachment. Judgment was entered against George W. Cameron, in favor of Beck and Roy Cameron, for the amount due upon the note secured by the mortgage; and it was ordered that the receiver proceed to the sale of the mortgaged property, and apply the proceeds first to the satisfaction of the Beck mortgage. From this judgment and decree the plaintiff appeals, and contends that the court erred in find-

ing that the Beck mortgage was prior and superior to the lien of plaintiff's attachment.

It is first contended that the mortgage is void as to this plaintiff for the reason that it was withheld from record for the purpose of giving George W. Cameron a fictitious credit, and that this was such fraudulent conduct on the part of these mortgagees as avoided the mortgage as against this plaintiff and its claims.

It appears from the record that the mortgage was executed on the 30th day of November, 1914, and was not recorded until the 23d day of February, 1915. The affirmative evidence is that there was no agreement between George W. Cameron and these mortgagees that the mortgage should not be recorded at once; that there was no agreement to withhold it from the record for the purpose of giving Cameron a fictitious credit, or for any other purpose. It is claimed, however, that the facts and circumstances indicate such a purpose and intent. We have examined the record upon this point, and find that the note sued upon in the first count of plaintiff's petition was dated October 29, 1914, and that this indebtedness, therefore, was created before this mortgage was given, and the withholding of the mortgage could not have the effect of inducing this credit.

The second count of the petition is based upon an overdraft. This overdraft was permitted after plaintiff had acquired knowledge of the existence of this mortgage. Therefore, the withholding of it from the record could not have induced this credit.

The other counts of the petition are based upon claims due other parties which were purchased by and assigned to the plaintiff after it had full knowledge of the existence of this mortgage, and, therefore, the withholding of the mortgage from the record could not have induced any action on the part of the plaintiff. In fact, the plaintiff

shows that these claims were purchased after the mortgage had been placed of record. The rule in this state is that the withholding of a mortgage from record does not defeat the mortgage as against general creditors, unless it is withheld by agreement between the mortgagor and mortgagee, to give to the mortgagor a fictitious credit; and, of course, it must tend to have that effect in order to defeat the mortgage. None of these elements are found in this case. The consideration in the mortgage appears to be substantially this: George W. Cameron borrowed $800 from the plaintiff bank, executed his note for the same, with Roy Cameron as surety, and this note was subsequently paid by Roy. It is conceded that Roy is absolutely good. Beck was surety for George W. Cameron on an appeal bond. The case went against him, and he became liable on this bond for about $700. The mortgage was executed to secure Roy Cameron, as surety upon the $800 note given to the plaintiff bank, and to secure Beck for the $700 which he was obligated to pay upon his bond, and, we understand, did pay, and $300 in money advanced to George W. Cameron by Beck. The mortgage was taken in the name of Beck, and was made as security for both claims. The testimony is that the mortgage was withheld from record by oversight; that there was no agreement that it should be withheld from record.

A short time before this suit was commenced, George W. Cameron had arranged to sell his stock of goods to one Garfield Dorsey, a brother-in-law of Roy Cameron's. George W. Cameron notified the plaintiff bank of this intended sale. The bank, through its cashier, acquiesced in the sale. Some controversy arose then between Roy Cameron and the bank as to what disposition should be made of the proceeds of the sale, Roy Cameron claiming that the proceeds should be paid to him to apply upon the mort-

gage; and this is what provoked the controversy resulting in the suing out of the attachment.

That this Beck mortgage rested upon a valid consideration, cannot be questioned under this record. The only theory upon which the plaintiff contends that the court erred in giving the mortgage precedence over the attachment, is found in the fact that the mortgage was not recorded until several months after it was executed; but, in order to make the withholding from record a basis for assuming the mortgage to be fraudulent, there must be some fraudulent purpose revealed in the withholding. As said in *Goll & Frank Co. v. Miller*, 87 Iowa 426, 431:

"There can be no doubt that the withholding of the mortgages from record, in pursuance of an agreement between the parties, could have but one object, and that was to maintain the credit of Miller, and lead parties with whom he dealt to give credit to him in the belief that he was not a chattel mortgaged merchant. In such a case it is well settled that the mortgagee cannot be permitted to insist on the validity of his mortgage, as against those who have given credit to the mortgagor under such circumstances. Such a transaction is fraudulent as to the other creditors."

It will be noted that plaintiff bank had no lien upon this property and acquired no lien upon the property until after the mortgage was recorded. It will be noted that some of the claims which the plaintiff seeks to enforce in this action against George W. Cameron accrued before the execution of the mortgage, some of them accrued after the plaintiff had acquired full notice of the existence of the mortgage, and some of them after the mortgage had been recorded; so that the plaintiff was not led into giving credit to George W. Cameron in the belief that he was not "a chattel mortgaged merchant." See *Falker & Stern v. Line-*

*han,* 88 Iowa 645; *Liddle & Carter v. Allen,* 90 Iowa 738, 741; *Richards v. Jewett Bros. & Co.,* 118 Iowa 629.

In *Richards v. Jewett Bros.,* last case above cited, a request was made for an instruction in substantially this language:

"Where a chattel mortgage is given upon a stock of merchandise, with the understanding or agreement that it shall be withheld from record for a specific time, and it is so withheld, it is fraudulent as to one who sells goods to the mortgagor after it was given, and before it was recorded, without notice thereof."

This court held that the instruction requested announced a correct rule of law.

It will be noted in all cases that the mortgage is held fraudulent only as to creditors whose debt came into existence after the mortgage was given, and before it was recorded, and who had no actual notice of the mortgage. It follows that one whose debt comes into existence before the mortgage was given, or one who has either actual or constructive notice of the mortgage before the debt comes into existence, has no protection under this rule; for, as to him, the mortgage is not fraudulent. It works no fraud. Under the facts of this case, we think it clear that the court did not err in holding that the Beck mortgage took precedence over plaintiff's attachment, and as to this holding, the case is affirmed.

It is contended, however, that the note sued on in the first count of plaintiff's petition was a demand note; that the plaintiff, relying upon the fact that the property was unencumbered, extended the time for the payment of this note, and that credit therefor was given to the defendant in reliance upon the apparent unencumbered condition of defendant's property. This contention will hardly do, in the face of the fact that, for some months after the mortgage was recorded, the plaintiff made no demand for the pay-

ment of this note, and for the further reason that, after plaintiff had full notice of the mortgage, it extended further credit to the defendant in the way of an overdraft, in the amount of $106. However that may be, we cannot reach any other conclusion, under this record, than that the Beck mortgage rests on a good consideration, and was not withheld from record for any fraudulent purpose, and that the plaintiff did not acquire any lien or interest in the property until long after the mortgage was recorded, and that no debt through which the plaintiff now seeks to fasten a claim on this property came into existence between the time of the execution of the mortgage and its filing of record.

Beck and Roy Cameron have cross-appealed, claiming that, after the court had found the mortgage valid and that it created a lien prior and superior to any claim of the plaintiff under its attachment, judgment **2. ATTACHMENT: indemnifying bond: judgment.** should have been rendered against the plaintiff upon its indemnifying bond; that these cross-appellants ought not to be forced to look to the mortgaged property for the satisfaction of their claim. The thought is that the levy of the attachment was a conversion of the mortgaged property which left the plaintiff liable upon its indemnifying bond to these mortgagees for the value of the property. In this we cannot concur. When the controversy arose between the plaintiff and these cross-appellants, a receiver was appointed, without objection, to conserve the property, pending the settlement of the controversy. The defendant did not convert the property or attempt to convert it after notice of plaintiff's claim. The application was made to the court, these cross-appellants came into court, the issues were fixed, and the property ordered held by the receiver, pending a settlement of that controversy. It is true that, upon the giving of the bond, plaintiff might have proceeded to the conver-

sion of the property to the satisfaction of its claim; but it did not do so. The property still remains in the hands of the receiver appointed in a suit to which both these contestants are parties. We do not find in the record that the cross-appellants have ever made specific objection to the appointment of the receiver, or to the conservation of the property pending the result of the litigation. The cross-appellants are not entitled to have the decree of the district court modified, as prayed, and as to this appeal the cause is also affirmed.

II. This brings us to a consideration of the second appeal.

It will be noticed from what has been said that, on the equity side, plaintiff was given judgment for the full amount of its claim against Cameron, and that the only matter continued for further consideration was the claim made by the defendant, George W. Cameron, in his counterclaim on the bond for the wrongful suing out of the attachment. A jury was impaneled in this matter, and the cause tried before Judge Ellison, and a verdict returned for the defendant in the sum of $1,172.98. Judgment being entered upon the verdict, plaintiff appeals.

We will not take up the contentions of the plaintiff in the order in which errors are assigned, but will dispose of each error in its logical order.

It is first contended that the undisputed evidence shows that the attachment was rightfully sued out, and that the plaintiff's motion for a directed verdict, therefore, should have been sustained; and reliance is had upon what is known as the Bulk Sales Law. It is true that, if any one of the grounds upon which plaintiff predicates his right to an attachment is true, the attachment cannot be said to be wrongfully sued out. The first ground of the attachment was that the defendant, George W. Cameron,

3. SALES: Bulk Sales Act: rebutting presumption of fraud.

was about to convert his property, to wit, a stock of general merchandise, into money, for the purpose of placing it beyond the reach of his creditors. Plaintiff's claim is that this was true; and if not, that the plaintiff had reasonable ground for believing it was true, at the time the attachment was sued out. Whether defendant was about to convert his property into money for the purpose of placing it beyond the reach of his creditors, is a fact question, and was for the jury. Whether plaintiff had reasonable cause for believing that the defendant was about to do so, is also a fact question. Independent of the Bulk Sales Law, it was for the jury to say, under this record, whether the facts alleged as a basis for the attachment were true or not. It was for the jury to say whether the plaintiff was justified in suing out the attachment, though the facts on which the attachment was predicated were not true, upon the theory that the plaintiff had reasonable ground for believing it was true. Independent of the statute referred to, the jury would be justified in saying that the ground was not true, and that the plaintiff had no reasonable ground for believing it to be true. A belief in the truth of the facts charged as a basis for an attachment is not sufficient to justify the issue of the attachment. The belief must be founded upon facts and circumstances within the knowledge of the attaching party, which, supposing him to be a man of ordinary prudence, judgment, and foresight, are sufficient to induce that belief; and this ordinarily is a question for the jury. The defendant was a merchant, engaged in business. The only two attempted dispositions of the property in controversy within the knowledge of the plaintiff, at the time this attachment was sued out, are to be found in the giving of this Beck mortgage, and the contemplated sale to one Dorsey. The record discloses that the plaintiff had no reasonable ground for believing that the mortgage was fraudulent, or that it was made for the purpose of disposing

of the property in fraud of creditors. The mortgage was a valid mortgage, given for a valid consideration, and was adjudged in the equity suit to be such. The sale to Dorsey, independent of the failure to conform to the Bulk Sales statute, cannot be said to be made with intent to defraud creditors, for the reason that, before the attachment was sued out, defendant notified plaintiff bank of the contemplated sale to Dorsey in bulk, took Dorsey to the bank and introduced him to the cashier of the bank, told the cashier all the facts connected with the contemplated sale, and that Dorsey had deposited—which was true—a sum of money in the bank to be used in the purchase of the stock. With these facts all before it, the bank consented to the sale to Dorsey, was present and saw Dorsey in possession, saw the invoice made, knew the price at which the stock was to be sold, and every fact touching the disposition of the property to Dorsey, before the attachment was sued out. The jury could well find that the sale, so far as George W. Cameron is concerned, was in good faith, made with the knowledge and consent of the plaintiff bank, and would have been fully carried out, had it not been for the issuing of the attachment.

It is contended, however, that the attempted sale to Dorsey, in bulk, is presumably fraudulent, and that the plaintiff was justified in indulging in this presumption at the time it sued out the attachment; that it cannot be said to have wrongfully sued out the attachment, on the ground that the defendant was about to dispose of his property with intent to defraud his creditors, and be mulcted in damages therefor, when the statute itself says that a bulk sale, without complying with the requirements of the statute, is presumptively fraudulent. The statutes relied upon are as follows: Section 2911-a of the Supplemental Supplement to the Code, 1915, which was in force at the time the attachment was sued out, reads as follows:

"No person * * * engaged in the retail * * * business of buying and selling merchandise for profit shall at a single transaction, and not in the regular course of business, sell, assign, or deliver the whole, or a major part of his stock * * * in trade unless he shall, not less than seven days previous to such sale, assignment, or delivery, send or cause to be sent to his creditors by registered mail, a notice of his intention to make such transfer, assignment or delivery, which notice shall be in writing describing in general terms the property to be sold, assigned, or delivered, and the parties thereto."

Section 2911-b provides: "All such sales, assignments, or deliveries * * * which shall be made without the formalities required * * * will be presumed to be fraudulent and void as against all persons who were creditors of the vendor at the time of such transaction; except creditors to whom notice was mailed * * * but if such creditors have received any part of the purchase price paid they shall be required to contribute equitably to those who have not received such notice."

It will be noticed from this statute that a failure to comply with its provisions renders the sale presumptively fraudulent and void against all creditors except those to whom notice is given. This statute creates a presumption against the *bona fides* of the transaction, when no notice such as the statute requires is given. No such presumption exists, however, though the sale is completed, in favor of any creditor who receives the notice provided for in the statute. The statute only raises a presumption against the *bona fides* of the transaction. It does not say that such sales without notice are absolutely fraudulent and void, but that such sales are presumed to be fraudulent and void. This is a fact presumption and rebuttable. The burden rests upon the merchant who attempts to justify a bulk sale without notice to negative this presumption. The presumption is

that he is trying to circumvent the creditors to whom he gives no notice, by making the sale of his stock in bulk. It cannot be presumed that he intended to circumvent those to whom he gives notice. That is the reason for the distinction. In the case at bar, Cameron owned a stock of goods. He contemplated selling it to one Dorsey. Before any sale was made, he brought Dorsey to the bank, introduced him to its cashier, told the bank of the contemplated sale, and that Dorsey had deposited with the bank an amount sufficient to cover the purchase price. Though this deposit, however, was made in Dorsey's own name, it was there for the purpose of use in consummating the sale. The jury could well find that the sale would have been consummated, had it not been for the serving of this attachment. The plaintiff bank, by its officers, was present at the time the invoice was made, saw Dorsey there, and knew that the sale was about to be made, with the understanding at the time between the bank and George W. Cameron that the money received from the sale should be deposited in the bank and used for the purpose of paying George W. Cameron's debts, and that the bank should take its indebtedness out of the fund so created. Some controversy arose later, however, between Roy Cameron, one of the persons claiming under the mortgage in the other suit, and the bank, as to what disposition should be made of the proceeds of the sale. Roy Cameron claimed that it should be paid to him, or to him and Beck, for the purpose of discharging their mortgage. To this the bank demurred, and, without consulting George W. Cameron, proceeded at once to sue out the attachment. The attachment was sued out. Thereafter, Dorsey refused to consummate the sale, withdrew his money from the bank, and left. The goods remained in the hands of the receiver appointed by the court at the instance of the plaintiff. That Dorsey contemplated purchasing these goods from Cameron, that he had entered into

an agreement to purchase them, that he had deposited with the plaintiff bank sufficient money to cover the purchase price, that an invoice was made of the goods, that Dorsey was in and about the store at the time the attachment was sued out, that plaintiff knew of the sale to Dorsey and consented, are matters, we think, well settled by the record. The levy of the attachment and the controversy that arose between the mortgagees and the attaching creditor seem to have discouraged Dorsey from any further proceeding in the matter, and he withdrew. The record shows that George W. Cameron attempted to comply with the Bulk Sales Law, and issued to all his creditors the notices required by the statute. The notice given, however, was a three days' instead of a seven days' notice. The notice informed the creditors that the sale to Dorsey would be made and the goods delivered within three days from the completed service of the notice. Prior to the session of the thirty-sixth general assembly, three days' notice was all that was required. The Session Laws of the thirty-sixth general assembly were not, at the time, published in book form, except as found in the Supplemental Supplement of 1915. The notice complied in every respect with the requirements of the statute, except as to the number of days that should intervene between the notice and the completed sale. This notice was given to the plaintiff before the attachment was sued out, and the plaintiff was notified verbally of the fact of the contemplated sale, and consented to it; knew that the intended purchaser had deposited in the bank sufficient funds to cover the purchase price. It agreed with Cameron that, when the sale was consummated, the proceeds should be deposited in the bank, to be applied on Cameron's debts. At that time, plaintiff knew of Beck's mortgage, and made no objection to the arrangement for the deposit of the proceeds of the sale with the bank, until, in some conversation with Roy Cameron, it conceived the idea, from

what was said, that the proceeds of the sale were to go to the satisfaction of the mortgage, rather than to the satisfaction of plaintiff's claim.

A creditor who participates in a bulk sale, who consents to the goods' being sold in bulk, in expectation that the proceeds of the sale are to be applied upon his indebtedness, cannot be heard to say that the sale was fraudulent and void simply because the notice of intent to sell in bulk did not comply with the statute. That is to say, a creditor who consents to a bulk sale, with the understanding that the money realized from the sale is to be paid in discharge of his obligations, cannot be heard to say that the contemplated sale was fraudulent on proof alone that the statutory notice was not given. The stopping of the sale by attachment on that ground alone cannot be justified upon a record which shows that the attaching creditor knew that the sale was about to be made, and consented to it. The notice required by the statute is for the benefit of the creditors. The statutory provision is to protect creditors, and can be waived by the party for whose benefit it was made. Where one consents to a thing's being done without compliance with the formalities of the statute, he cannot predicate fraud upon the doing of the thing to which he consents. He cannot be allowed to shield himself behind a statute made for his protection, when he consents to the thing's being done without the formalities of the statute.

III. It is next contended that the court erred in its instruction to the jury touching the measure of damages in the suit upon the counterclaim.

4. ATTACHMENT: wrongful attachment: damages for levy on mortgaged chattels.

It will be noted that this action is not an independent action on the bond to recover damages on account of the wrongful suing out of the attachment. It is by way of counterclaim to the claim made by the

plaintiff in his petition. The amount that defendant was actually damaged by the wrongful suing out of the attachment was a matter for the consideration of the jury. Before this suit was tried, it had been judicially determined that plaintiff was entitled to recover of the defendant upon the claims made in the several counts of its petition. In no event could the defendant recover more in a suit upon his counterclaim than the difference between the amount found to be due the plaintiff in its original petition, and the amount due the defendant upon its counterclaim. The judgment fixing the amount due plaintiff on the several counts of its petition was introduced in evidence.

All rules for the admeasurement of damage are based on the theory of compensation. The goods were sold to Dorsey for $2,374. Defendant had consented to the sale of the goods at that price. The jury would be justified in finding that this was the actual value of the goods at the time of the levy. Defendant had given a valid mortgage on these goods amounting to over $1,800, with interest. Defendant's interest in the goods levied upon, at that time, could not be more than the difference between the mortgage and the value of the goods. Prior to the trial upon the attachment, it had been judicially determined, in a suit to which all these parties were parties, that this mortgage was valid and a subsisting lien upon the property, and the receiver was directed to apply the attached property to the satisfaction of this mortgage; so that, before the trial of this action, the property had been practically taken or sequestered to the satisfaction of this $1,800 mortgage, with interest. Conceding that the attachment was wrongfully sued out, had the plaintiff taken all the property under his attachment and converted it to its own use, the plaintiff could not be held for more than the value of the goods taken. The amount which the defendant lost by the action of the plaintiff in attaching the property could not

be more than that under the conditions disclosed. After the attachment had been served, however, defendant's mortgagee appeared, and showed a right, given to him by the defendant, to take from the plaintiff more than $1,800 worth of these goods. In fact, defendant stipulated—though this stipulation was not permitted to go into the record, and we think it was error in the court to refuse it—as follows:

"1. That whereas the said George W. Cameron has been heretofore and now is the owner of a stock of general merchandise [locating it];

"2. And whereas said George W. Cameron proposes to make sale in bulk of said stock of merchandise;

"3. And whereas said George W. Cameron is indebted to the plaintiff, for which indebtedness action has been brought in the above-entitled court, and an attachment issued and levied upon said stock of merchandise;

"4. And whereas there are certain claimed mortgage liens on said stock of goods running to Martin P. Beck et al.;

"5. And whereas said stock of goods has been invoiced at $2,374;

"6. And whereas one Garfield Dorsey stands ready and willing to buy said stock of goods at and for the sum of $2,374, and has deposited said sum of $2,374 in the Palo Savings Bank [plaintiff bank], pending the transfer of said stock of goods to the said Garfield Dorsey:

"7. It is therefore agreed by and between the Palo Savings Bank, party of the one part, and George W. Cameron, Martin P. Beck et al., and Garfield Dorsey, party of the other part, that the proposed sale of such stock of merchandise to the said Garfield Dorsey shall be consummated upon the condition that the purchase price, being the invoice price as above set forth, shall be deposited in the Palo Savings Bank, to there remain in lieu of and in the place of said stock of goods, and until the rights of the

plaintiff under its attachment levy on the stock of goods, and until the rights of said Martin P. Beck *et al.* under their claimed mortgage liens, shall have been fully determined and adjudged by the courts, and shall then be disbursed as may be directed by the final order, judgment or decree of the courts.

"8. This stipulation is made without prejudice to the rights of any of the parties claimant, but solely for the purpose of continuing said store and stock of goods for sale without interruption and as a going business, and the rights of the parties, plaintiff and others, to the money so deposited, and whatever liens or rights they have thereto, shall attach to the money as to the property under priority to be determined by the court."

This stipulation was signed by all the parties to this suit. Before the suit on the counterclaim was tried, it had been fully determined and adjudicated on the equity side of the court that the mortgage given by the defendant was a prior lien to the levy of the attachment; and the court directed that the attached property should be disposed of, and the proceeds applied to the payment of this obligation for which the defendant was liable. The defendant was a party · to this proceeding, and made no objection to the order and direction of the court so made, and the amount lost by the defendant by the attachment could not have exceeded the difference between the amount due upon the mortgage and the actual value of the goods; and against this sum the plaintiff was entitled to an offset on the amount due it on the several counts of its original petition, to which the counterclaim was filed. If the amount due upon the counterclaim had been less than the amount of plaintiff's claim, then plaintiff would be entitled to judgment for the difference between the amount due it, upon its claim, and the amount found due upon the counterclaim. If the amount due upon the counterclaim exceeded the amount

due plaintiff upon its original claim, then judgment should have been entered for the defendant for the difference.

The rule for the admeasurement of damages given by the court authorized the jury to find, and it did find, a verdict for the defendant for $1,172.28, as damages for the wrongful suing out of the attachment. All that is shown is that the levy of the attachment prevented the defendant from consummating a sale which he had already made for $2,374, with a mortgage of over $1,800 against the stock, and that, after the levy, these mortgages, under the order and direction of the court, sequestered the property or its proceeds, leaving the plaintiff with nothing in its hands more, at the most, than the difference between the amount due upon the mortgage and the actual value of the stock. The rules laid down for the guidance of the jury in admeasuring damages, allowed the jury, in fixing its verdict, to award the defendant far more than, under any theory of the record, the defendant could possibly have suffered in the way of damages. As bearing upon this question, see *Emerson & Co. v. Converse*, 106 Iowa 330, and cases therein cited.

For the errors pointed out, the case is—*Reversed*.

PRESTON, C. J., WEAVER and STEVENS, JJ., concur.